FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jan 23, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| MARK PETERSON, an individual,<br><br>              Plaintiff,<br><br>    v.<br><br>CITY OF YAKIMA, a local government entity; TONY O'ROURKE, an individual human; MARK SOPTICH, an individual human; and ANTHONY DOAN, an individual human,<br><br>              Defendants. | NO: 1:18-CV-3136-RMP<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

BEFORE THE COURT is Defendants City of Yakima et al.'s Motion for

Summary Judgment on all claims, ECF No. 17, and Plaintiff Mark Peterson's

Motion for Partial Summary Judgment on the liability portion of his First

Amendment Retaliation Claim, ECF No. 22. Having heard oral argument from the

parties, reviewed all submissions related to the pending motions, and studied the

relevant law, the Court is fully informed.

In the Amended Complaint, Plaintiff asserts eight claims against Defendant City of Yakima ("the City"), as well as against Defendants Tony O'Rourke, Mark Soptich, and Anthony Doan in their individual capacities: (1) First Amendment retaliation under 42 U.S.C. § 1983; (2) Fourth Amendment wrongful prosecution under 42 U.S.C. § 1983; (3) Fourth Amendment retaliation under 42 U.S.C. § 1983; (4) Fourteenth Amendment due process violation under 42 U.S.C. § 1983; (5) *Monell*[1] liability for the City by ratification of Defendant O'Rourke of Defendants Soptich's and Doan's acts allegedly in violation of the First, Fourth, and Fourteenth Amendments; (6) *Monell* liability for the City by Defendant O'Rourke engaging in the allegedly unconstitutional acts while he was the final policymaker for the City, or, alternatively, by the City Council assenting to or being deliberately indifferent to Defendant O'Rourke's alleged constitutional violations; (7) common law civil conspiracy; and (8) state law malicious prosecution.  ECF No. 1-2.

Defendants seek summary judgment in their favor on all of Plaintiff's claims. ECF No. 17.  Plaintiff seeks partial summary judgment in his favor on the First Amendment retaliation claim, with damages reserved for trial.  ECF No. 22.

## EVIDENTIARY OBJECTIONS

Before the Court can synthesize the undisputed and disputed material facts related to the instant motions, the Court first must determine the appropriate scope of

---

[1] 436 U.S. 658 (1978).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 2

the evidentiary record at summary judgment.  Therefore, as a preliminary matter, the

Court resolves Defendants' request to strike paragraphs from Plaintiff's statement of

material facts and Defendants' evidentiary objections to several of Plaintiff's

attached documents as unauthenticated.  *See* ECF Nos. 27 at 5; 28.  The Court

further resolves Plaintiff's evidentiary objections to Defendants' statements of fact.

*See* ECF No. 31.

### *Unsupported by Record*

Defendants move to strike approximately 56 paragraphs of Plaintiff's

Statement of Material Facts filed in support of Plaintiff's Motion for Partial

Summary Judgment on the basis that those paragraphs are "not supported by any

evidence found in this Court's record as required by Local Civil Rule 56(c)(1)(A)."

ECF No. 27 at 2.

However, in resolving the parties' motions, the Court has scrutinized both

parties' statements of facts, and the materials that they cite in support, to ensure that

the assertions of fact upon which the Court relies are supported by the evidence in

the summary judgment record.[2]  *See* Fed. R. Civ. P. 56(c).  The Court does not find

---

[2] The Court notes that Plaintiff cited to a number of documents or portions of
depositions in their pleading at ECF No. 22, but did not file the relevant documents
or portions of depositions until filing supplements with their reply brief at ECF No.
42.  The Court has reviewed and relies on those supplemental filings and notes that
Defendants did not renew any objections after Plaintiff filed the supplemental
documents, nor did Defendants request an opportunity to file a sur-reply.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 3

the additional step of striking paragraphs from Plaintiff's Statement of Material

Facts to be warranted. Therefore, the Court denies Defendants' motion to strike

paragraphs from Plaintiff's Statement of Facts.

### Authentication and Hearsay

Both parties make a large number of boilerplate objections to each other's

statements of material fact and to some of the evidence that the opposing party relies

on in support of its summary judgment motion. ECF Nos. 27, 28, and 31.

At the summary judgment stage, the Court is concerned with whether "the

material cited to support or dispute a fact cannot be presented in a form that would

be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Therefore, courts may

consider material that may be admissible in some other form at trial. *See Block v.*

*City of L.A.*, 253 F.3d 410, 418−19 (9th Cir. 2001). Authentication and hearsay

challenges are among those evidentiary objections that may be overruled when the

evidence could be presented in admissible form at trial. *See Comite de Jornaleros*

*de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 964 n. 7 (9th Cir. 2011)

("Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be

presented in an admissible form at trial."); *Lawrence v. City & Cty. of San*

*Francisco*, 258 F. Supp. 3d 977, 986 (N.D. Cal. 2017) (overruling objections based

on hearsay and authentication because the contents of the exhibits could be

presented in an admissible form at trial).

The many hearsay objections by Plaintiff are conclusory and identify whole documents as hearsay, rather than particular statements within those materials. *See* ECF No. 31. The Court is left to determine in a vacuum whether Defendants may be able to offer the materials under a hearsay exception or for a purpose other than the truth of the matter asserted. *See* Fed. R. Evid. 801, 802. Likewise, Defendants' authentication objections are sparsely developed and largely take issue with questions that Plaintiff asked of witnesses about documents, such as an email, after the witness denied knowledge about the document. *See, e.g.,* ECF No. 28 at 11. Courts do not not rely on speculation or irrelevant testimony or materials to resolve summary judgment motions. *See Burch v. Regents of the University of California*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be considered on a motion for summary judgment. Objections on any of these grounds are simply superfluous in this context.") (emphasis in original). The Court does not sustain the parties' objections to materials that may otherwise be admissible at a potential trial in this matter and, instead, relies on the Fed. R. Civ. P. 56 standard itself to determine what materials to consider and include in the background summary.

Accordingly, the Court overrules the parties' objections for purposes of the summary judgment motions.

***Expert Opinion***

Defendants seek to strike paragraph 149 of Plaintiff's Statement of Material

Facts:

> Mr. [sic] According to Plaintiff's fire inspection expert, Ted Erb:
> In the documents reviewed it appears that the fire
> inspector [Defendant Tony Doan] was asked to set up
> the reinspection so Mr. Peterson could be there during
> the inspection. Whe [sic] the fire inspector showed
> [sic] and was asked to make an appointment with Mr.
> Peterson [sic] the fire inspector [sic] this as not
> being allowed entry. It is my professional opinion that
> his [sic] was not a denial of entry but a request and that
> the fire inspector left of his own decision.

ECF No. 23 at 28 (citing ECF No. 25-24 at 16).[3]

Defendants seek to strike this opinion from the summary judgment record

because the specialized knowledge that Mr. Erb purports to offer is that of a fire

inspector. Defendants argue that Mr. Erb's "opinion regarding probable cause is

useless to a jury and should be stricken from this record." ECF No. 27 at 3.

Defendants further contend that Mr. Erb's opinion is immaterial since the

prosecuting attorney "used her independent judgment to determine whether or not to

charge Mr. Peterson with a crime." *Id.*

---

[3] The Court notes that although Plaintiff's Statement of Material Facts, paragraph
149, purports to quote from Mr. Erb's Expert Witness Report, there are minor
variations between the language of paragraph 149 and the relevant language of Mr.
Erb's report. *Compare* ECF Nos. 23 at 28 and 25-24 at 16.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 6

Plaintiff replies that Defendants' effort to strike Mr. Erb as a qualified expert is untimely and procedurally improper. ECF No. 40 at 4−5. Plaintiff argues that Defendants' challenge to the admissibility of Mr. Erb's opinion is untimely, as it was not submitted by the deadline for *Daubert*[4] motions to exclude expert testimony that was set by the Jury Trial Scheduling Order, ECF No. 12. *Id.* Plaintiff asks the Court to strike Defendants' motion to strike. *Id.*

Expert testimony is governed by Federal Rule of Evidence 702, which reads:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert has the burden of establishing that the expert's testimony meets the admissibility requirements by a preponderance of the evidence. Fed. R. Evid. 104; *see* Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Generally, relevant expert testimony is admissible. *See* Fed. R. Evid. 402. "Shaky but admissible evidence is to be attacked by cross examination, contrary

---

[4] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

evidence, and attention to the burden of proof, not exclusion." *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 813 (9th Cir. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)).

Defendants' conclusory assertion that Mr. Erb lacks the requisite expertise to opine as to whether Mr. Peterson denied entry to a fire inspector is insufficient to support exclusion of paragraph 149 from Plaintiff's Statement of Material Facts. Defendants do not question whether Mr. Erb based his opinion on sufficient data, and Mr. Erb did not opine as to whether the prosecuting attorney's decision was supported by probable cause. Rather, as Mr. Erb's *vitae* indicates, he has "19 years of experience doing fire inspections in commercial buildings of all occupancy types," among other qualifications that form an adequate basis for his opinion to assist a trier of fact in understanding the context in which the fire inspector interpreted Mr. Peterson's actions as a denial of entry. ECF No. 25-24 at 23.

Furthermore, Defendants' argument that the opinion is immaterial is not a basis to strike, as the Court disregards evidence that is irrelevant or immaterial. *Burch*, 433 F.Supp.2d at 1119 ("A court can award summary judgment only when there is no genuine dispute of *material* fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant.") (emphasis in original). Defendants' request to strike is denied.

///

## BACKGROUND

The following facts are undisputed unless otherwise noted. Plaintiff Mr. Peterson owns H&H Furniture, a 50-year-old family business in Yakima, Washington, with locations elsewhere in Eastern Washington at certain points in its history and two locations currently operating. ECF No. 24-1 at 3−4. Mr. Peterson began working at the family business full time in 1988. *Id.* at 4. By 2014, the business employed ten to twelve people. *Id.* at 5. H&H Furniture occupies two buildings in downtown Yakima that were constructed in the 1920s. *Id.* at 6−7. The addresses are 211 and 213 West Yakima Avenue, and each building is comprised of three floors, each covering 6,000 square feet. ECF No. 24-1 at 6. Approximately 4,000 square feet of the basement of the building at 213 West Yakima Avenue is open to the public. *Id.*

Mr. Peterson testified at deposition that H&H Furniture now employs three part-time employees, and two full-time employees, in addition to himself. ECF No. 24-1 at 5. He asserts that business has "dropped off," and he attributes the decreased sales to damage to his reputation by the "action the City took" against him. *Id.*

### *Pre-2013 Fire Code Inspections*

On approximately August 14, 2002, a former City of Yakima fire code inspector, Mary Valladares, inspected the H&H Furniture business premises and noted her concerns in a letter sent to Mr. Peterson the next day. ECF Nos. 21 at 2;

19-1 at 21−22. One of the problems noted was that the ceiling basement had "holes, breaches and exposed ceiling construction." ECF No. 19-1 at 22. Related to that observation, Ms. Valladares cited a building code section requiring usable basement space to be protected "as required for one-hour fire-resistive construction." *Id.* In an unsigned follow-up letter dated September 23, 2002 ("the 2002 letter"), and addressed to Mr. Peterson, Ms. Valladares set forth several "requirements . . . to be addressed in the basement to continue its use as a showroom[,]" including:

> The ceiling in the basement has holes, breaches and exposed ceiling construction.
>      1)    All holes and breaches in walls must be repaired.
>      2)    Ceiling must contain one-hour separation from first floor throughout basement. Current material not one-hour construction and some areas exposed.
>      3)    Submit construction plans for permit application for this project.

ECF No. 24-9 at 4 (boldface in original removed).

Ms. Valladares again performed a fire code inspection of H&H Furniture in April 2007 and found "no violations" and expressed no concerns about the basement ceiling. ECF No. 24-17 at 2−11. A different fire code inspector, Chuck Heath, inspected the H&H Furniture premises in March 2008, March 2009, March 2010, March 2011, and found no violations related to the ceiling. ECF Nos. 14-19 at 2−11 (2009); 24-20 at 2−11 (2010); 24-38 at 2 (2008); 24-39 at 2 (2009); and 24-10 at 2−11 (2011).

///

***Public Issue Advocacy***

Mr. Peterson has spoken out against City projects with which he disagrees since at least 2001, when, as he describes it, he successfully led an effort opposing the construction of an underpass on Yakima Avenue. ECF No. 26 at 2−3. Mr. Peterson recalls that he "petitioned against the project, . . . gathered signatures, . . . spoke at city council meetings, . . . communicated with the mayor, and spoke to numerous media outlets about the projects[.]" *Id.* at 3.

In January 2013, Mr. Peterson emailed Yakima Police Chief Dominic Rizzi with a suspicion that a customer who had leased a television from Mr. Peterson's business, and had reported the television stolen the same day, had filed a false police report. ECF No. 25-3 at 2. Mr. Peterson also asserted that the Yakima Police Department had been unresponsive when Mr. Peterson brought his concerns to a Yakima Police Officer, who had initially agreed with Mr. Peterson that the reported theft "sounded suspicious," but then failed to further investigate. *Id.* at 2−3. Mr. Peterson concluded his email to Chief Rizzi:

> A friend of mine who is an elected official, [sic] thought this lack of any response was because of the problem I had with the YPD on a burglary at my business that was not investigated. It was brought to the attention of the city council, which greatly upset your predecessor. I hope nothing that unprofessional could happen within your department.
>
> In my years as a business professional, I have found it impossible to correct a problem or poor behavior of my staff unless I'm aware of the situation. It is with that in mind that I sent you this email.

I look forward to your reply. I also hope to see you at one of the monthly Board Meetings of the Yakima County Crime Stoppers or the Citizens for Safe Communities.

*Id.* at 3.

Chief Rizzi responded that he would look into the matter and "have a supervisor contact" Mr. Peterson. ECF No. 25-4 at 2. Chief Rizzi inquired with Yakima Police Captain Rod Light, who responded, in part: "Pretty typical behavior for Mark Peterson." ECF No. 25-6 at 2.

Around 2012, Yakima City Manager Defendant Tony O'Rourke recommended that the City Council create a new Economic Development Manager position and hired Sean Hawkins to perform job. ECF No. 25-26 at 4. Part of the work that Mr. Hawkins, the City Council, and others were working on was the development of a master plan to "really facilitate the development of the downtown district, so not only transportation projects, the plaza project . . . those are the really big ones." *Id.* Mr. O'Rourke put Mr. Hawkins in charge of the public process for receiving feedback from community stakeholders regarding the master plan in general and the plaza project in particular, and Mr. Hawkins reported back to Mr. O'Rourke. *Id.* at 6, 13. The master plan anticipated that the public process would be complete by fall 2013, at which point the projects related to the plan would proceed to the City Council for adoption. *Id.* at 6. Mr. O'Rourke "lobbied" the City Council to fund and implement the plaza project. *Id.* at 13.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 12

On August 2, 2013, Mr. Hawkins sent Mr. Peterson's contact information to Debbie Cook, who headed the City's utilities and engineering department and reported back to Mr. O'Rourke. ECF No. 32-6 at 2. Mr. Hawkins stated in his deposition that he did not know why Ms. Cook wanted Mr. Peterson's information. ECF No. 25-6 at 16.

On October 14, 2013, Mr. Hawkins spoke at a sparsely attended meeting of the Westside Merchants and Business Association. ECF No. 25-26 at 17. Mr. Peterson attended the meeting and spoke against the plaza and other potential master plan developments. ECF No. 25-26 at 17. Mr. Hawkins recalled "being pretty embarrassed at this meeting because of Mark's behavior because we had a brand-new businessperson who was getting ready to open up a restaurant and had to tell that particular person that this person is not reflective of the whole, even close of the whole, of the opinions of downtown." *Id.* Mr. Hawkins did not recall speaking to Mr. O'Rourke about what happened at the meeting. *Id.*

Mr. Peterson then organized a meeting for the morning of October 30, 2013, at a local restaurant to inform "those affected" of the "ramifications" of the City's plans to reduce traffic on Yakima Avenue and develop the plaza. ECF No. 25-26 at 19. One of the business owners who received that email forwarded it to Mr. Hawkins, asking "Are you aware of this?" *Id.* Mr. Hawkins does not recall attending the meeting or responding to the person who forwarded it to him. *Id.*

***November 5, 2013 Morning Meeting, Fire Code Inspection, and City
Council Hearing***

On November 5, 2013, Mr. Peterson attended a morning meeting at a
restaurant in downtown Yakima at which Mr. O'Rourke was responding to questions
from the public, mostly downtown business owners, about the plaza project. ECF
No. 24-4 at 10. Mr. Peterson recalled asking the first question at the meeting and
further recalled Mr. O'Rourke's response as dismissive. ECF No. 19-1 at 11. Mr.
O'Rourke recalled Mr. Peterson asking a question at the meeting. ECF No. 24-4 at
10.

The same day, Defendant Anthony Doan, a City Fire Code Inspector hired in
August 2013, conducted five "annual inspections." ECF Nos. 25-7 at 2; 25-8 at 2.
Mr. Doan conducted his first inspection at 9:54 a.m. at a hotel at "401 E Yakima
AVE," finished at 10:47 a.m., and next inspected an apartment building at "27 S 4th
AVE" from 10:51 a.m. until 12:50 p.m. *Id.* Inspector Doan did not record any
inspections between 12:50 p.m. and 2:41 p.m. *Id.* Inspector Doan resumed
inspections at 2:41 p.m. at "201 W Yakima AVE," an architectural firm, leaving
seven minutes later. *Id.* Inspector Doan arrived at H&H Furniture at "213 W
Yakima AVE" to inspect the premises at 2:52 p.m. on November 5, 2013. *Id.*

The parties dispute whether H&H Furniture was the next business in line as
Mr. Doan inspected businesses along West Yakima Avenue. *Compare* ECF No. 39

at 5 (Defendant's Reply Statement of Material Facts) *with* ECF No. 31 at 10

(Plaintiff's Statement of Disputed Facts).  Mr. Doan recalled that he and another

inspector, Chuck Heath, were "working Yakima Avenue," which "kind of splits the

north-south line of the city," and Mr. Heath worked one side while Mr. Doan

inspected properties on the other side.  ECF No. 19-1 at 134.  Mr. Doan denies that

he had any sense of Mr. Peterson's activities in the community, had discussed H&H

Furniture with anyone prior to the inspection, or had singled out Mr. Peterson or

H&H furniture for an inspection on that particular day.  ECF Nos. 20 at 2; 32-1 at

10.

Mr. Peterson was not at the business at the time of the inspection, and the

store manager, Steve Sargent, accompanied Mr. Doan throughout the premises.  *See*

ECF No. 24-13.  Mr. Peterson returned from the meeting regarding the master plan

and the plaza while Mr. Doan was still on the H&H Furniture premises.  ECF No.

19-1 at 10.  Mr. Doan was concerned about the state of the basement, particularly

that it was being used as a showroom for furniture while there were exposed portions

of the ceiling.  *Id.* at 139−40.  Mr. Doan recalled that he suspected that the "fuel

load," meaning the potential for furniture to provide "a lot of fuel for a fire,"

combined with the exposed beams, required a "fire separation," meaning "a material

that is rated in the code and designed to prevent fire from spreading to . . . other

floors."  *Id.* at 137.

Mr. Doan's "Completed Inspections" report from November 5, 2013, indicates that he left H&H Furniture at 3:34 p.m. and conducted one more annual inspection that day, of an emergency shelter at 215 W Yakima Avenue from 3:40 to 4:13 p.m. *Id.* Mr. Doan prepared a Fire Inspection Report following the November 5, 2013 inspection of H&H Furniture and emailed it to an email address used by Mr. Peterson. ECF No. 19-1 at 28, 168−69. The Fire Inspection Report included a recommendation for a "walk-through with Deputy Chief to go over fire fighter safety in basement" and set a "Compliance Reinspection" for November 20, 2013. *Id.* at 168−69.

After the inspection, Mr. Doan conferred with his supervisor Defendant Mark Soptich, then a Yakima Deputy Fire Chief, about what Mr. Doan observed at H&H Furniture. ECF Nos. 19-1 at 139; 24-3 at 13−14. Post-inspection conversations between Mr. Doan and Mr. Soptich were common. ECF No. 19-1 at 139.

Mr. Soptich sent an email to Glenn Denman, a City Supervising Code Inspector, just before 5 p.m. on November 5, 2013, stating:

Glenn,

H&H Furniture located at 213 West Yakima Ave.

Thanks,
Mark

ECF No. 25-9 at 2.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 16

On the evening of November 5, 2013, Mr. Peterson was one of many attendees at a City Council meeting. *See* ECF No. 24-4 at 13. Mr. Peterson spoke at the meeting about his concerns as a downtown business owner about the master plan, including about the plaza project. ECF No. 19-1 at 25–26. Mr. O'Rourke recalled Mr. Peterson speaking at the meeting. ECF No. 24-4 at 10.

On November 6, 2013, at 10:10 a.m., Mr. Denman responded to Mr. Soptich and stated:

> I found the document. It was approved to have a showroom in the basement of 2002, but there were conditions for this. I do not find where the conditions have been met, as there are no permits issued for any of the work that the conditions require.
>
> Attached is the scanned letter.
>
> Thanks,
> Glenn

ECF No. 25-9 at 2.

Mr. Soptich forwarded Mr. Denman's email to Mr. Doan at 10:58 a.m., adding "Knowledge is power. Get with me." ECF No. 24-9 at 2.

### Fire Code Inspection Follow-up and Contemporaneous Developments

On November 7, 2013, Mr. Hawkins included Mr. Peterson on a list of suggested stakeholders to sit on an "Implementation Oversight Committee" that would review master plan implementation proposals and "provide recommendations

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 17

to the City Council for any expenditure of public resources throughout the life of the implementation plan."  ECF No. 25-6 at 8, 23.  Mr. Hawkins sent the list to Mr. O'Rourke and Mr. O'Rourke's executive assistant, Cally Price, for Mr. O'Rourke to decide who to recommend to the City Council for the Committee.  *Id.* at 24.

On November 9, 2013, Mr. Peterson sent an email to Mr. Hawkins and others that related to the downtown master plan and the plaza.  ECF No. 25-26 at 25.  On November 12, 2013, Mr. Hawkins forwarded the email to Mr. O'Rourke and Ms. Price relaying, "I really suggest that we don't include Mark on the implementation team.  He will be difficult."  *Id.*  Mr. Hawkins explained that he changed his mind about recommending that Mr. Peterson be included on the Implementation Oversight Committee because of Mr. Peterson's comments, which Mr. Hawkins interpreted to signify that Mr. Peterson's "mind [was] made up," at the October 14, 2013 meeting.  *Id.*

Also on November 12, 2013, Mr. Denman conveyed advice from Senior Assistant City Attorney Mark Kunkler regarding H&H Furniture to Mr. Soptich and Mr. Doan:

> I just spoke with Mark Kunkler and his advice was to go ahead and have them do the work that was prescribed in the letter from 2002.
>
> With that being said, I suppose we need to set a time frame for when the work must be completed. Maybe 90 days?
>
> Let me know what you think on this.

ECF No. 26-1 at 2. Mr. Kunkler's office was located nearby the code enforcement officers' offices, while the rest of the City's legal department was located in another building. ECF No. 24-5 at 9.

Mr. Doan wrote a letter to Mr. Peterson dated November 18, 2013, revising Mr. Doan's previous recommendation for a walk-through:

> After further inquiry with the City of Yakima Code Administration; it was learned that a letter was addressed to you on September 23, 2002 discussing this issue. Please see the attached letter dated September 23, 2002 to review the requirements that were set forth at that time that would allow you to continue to use the basement as a showroom. Please note specifically items 2) and 3) under the heading "The ceiling in the basement has holes, breaches and exposed ceiling construction"; item 2) reads that the ceiling must contain a one-hour separation from first floor throughout basement. Current material not one-hour construction and some areas exposed. Item 3) submit construction plans for permit application for this project.
>
> All the requirements of this letter are expected to be met in full by January 31, 2014 [sic] in order for the basement to continue being used as a showroom. Your cooperation on this matter is paramount in achieving a safe environment for all of your customers.

ECF No. 24-11 at 2.

Mr. Doan testified at deposition that he did not investigate whether the assessment from Ms. Valladares that installation of a one-hour separation in the H&H Furniture basement was necessary. ECF No. 24-2 at 5. Mr. Doan does not recall any conversation with Mr. Soptich or anyone else about how much time would reasonably be required to install a one-hour separation. *Id.* Mr. Kunkler recalls both Mr. Doan and Mr. Denman separately discussing concerns about whether the H&H

Furniture premises were "grandfathered in" for purposes of using the basement in a manner that was permitted under prior code. ECF No. 25-28 at 8. Mr. Kunkler does not recall researching whether the H&H Furniture basement ceiling was grandfathered in and believed that Mr. Denman was looking into the issue himself. *Id.* Mr. Denman testified that he is not certain that a change in condition, such as using the basement for a showroom after it had previously been used for storage, had taken place and triggered the requirement that a one-hour separation be installed. ECF No. 24-7 at 5. Rather, he relied on the 2002 letter and "assume[d] that a change of condition took place at that point when that fire inspector said we needed installed a one-hour ceiling." *Id.*

Mr. Doan hand-delivered the letter to Mr. Peterson at H&H Furniture on November 19, 2013. ECF No. 25-11 at 2. Attached to the letter were the 2002 letter and Mr. Doan's business card. *Id.*

On November 21, 2013, Mr. Doan returned to H&H Furniture to perform a re-inspection. ECF No. 24-13 at 6. Mr. Sargent informed Mr. Doan that Mr. Peterson would accompany Mr. Doan. *Id.* Mr. Doan waited approximately five minutes before inquiring with the receptionist whether Mr. Doan should come back another time. *Id.* The receptionist advised Mr. Doan to call to set up an inspection. Mr. Doan called the business later that day, and, according to Mr. Doan, Mr. Sargent agreed to pass along Mr. Doan's information to Mr. Peterson the next day. *Id.*

On November 26, 2013, Mr. Doan again returned to H&H Furniture to perform a re-inspection. ECF No. 24-13 at 6. According to Mr. Doan, the receptionist greeted him, informed him that Mr. Peterson was busy and would not be able to meet with Mr. Doan at that time. *Id.* Mr. Doan handed the receptionist his card and told her that he "would like to set up an appointment with Mr. Peterson at a time that is good for him . . . to do a compliance re-inspection." *Id.*

On November 29, 2013, Mr. Peterson sent an email to Mr. Doan requesting all of the prior inspection records from his two properties and asserting, "The timing of your visit in October is also deeply troubling to me . . . it seems you and your office may be politically influenced." ECF No. 24-13 at 6. Mr. Doan recalled discussing the November 29 email with Mr. Soptich and Mr. Heath on the morning of December 2, 2013. *Id.* at 7. Mr. Doan testified that he tried to obtain copies of the inspection reports but could not. *Id.* Consequently, Mr. Doan emailed Mr. Peterson the same day, explaining that he could obtain the prior fire code inspection reports through a public records request from the Office of the City Clerk. *Id.*

On January 14, 2014, Mr. Doan returned to H&H Furniture to schedule a re-inspection. ECF No. 24-13 at 7. Mr. Doan met with Mr. Peterson in person, who Mr. Doan recalled saying that "nothing had been fixed because the inspections [were] under appeal with city council." *Id.* at 8. Mr. Doan brought with him a letter

memorializing the message that Mr. Doan recalls conveying to Mr. Peterson that day:

> I am here today to schedule an appointment to complete a compliance inspection. There are items on the original inspection report, dated 11/05/2013, that were due for re inspection on 11/20/2013 (see attached report). These Items are more than 2 months past due and multiple attempts to schedule the re inspection have been unsuccessful.
>
> It is very important that I hear from you by no later than 5:00 P.M today to agree upon a scheduled time. The re inspection must be completed within the next two weeks. If this does not happen, I will turn this matter over to Deputy Chief Soptich for further code enforcement.

*Id.*

On January 16, 2014, Ms. Price emailed Mr. Soptich asking for a "history on H&H Furniture" and whether there were "any other businesses where we have worked with the property owner to resolve deficiencies." ECF No. 19-1 at 124. Mr. Soptich responded by email the same day informing Ms. Price: "We are currently working with [Code Administration Manager and Fire Marshal] Joe Caruso on H&H for non-compliance from our annual inspection. One of issues [sic] is violations from our annual inspection and the second is an issue from them using their basement as a show room [sic] for about 12 years without having brought the basement up to code." *Id.; see also* ECF No. 25-27 at 3.

Ms. Price sought more information from Mr. Soptich on January 21, 2014. *Id.* Later that day, Mr. Soptich emailed Ms. Price a memorandum addressed to Mr. O'Rourke, entitled "Fire and Life Safety Inspection Program Update." ECF No. 24-

24. The document included a description of the inspection and re-inspection attempts at H&H Furniture, asserting: "H&H Furniture has been more problematic as the owner is less willing to work with the fire department to mitigate their violations." *Id.* at 4. The memorandum also provided: "A contractor's estimate to provide a 1 hour separation between the basement and the 1st floor is about $1.00 per square foot." *Id.* At deposition, Mr. Soptich could not recall the source of his information about the contractor's estimate. ECF No. 42-6 at 3. Mr. Peterson submits an expert opinion proffering that the $1.00 per square foot estimate "is woefully underestimated" and the installation of a one-hour fire separation could "range from the high 10s of thousands to 100's [sic] of thousands of dollars depending on what option was used." ECF No. 25-24 at 15. Mr. Soptich considered the memorandum he emailed to Ms. Price his "final version." ECF No. 24-3 at 17.

However, Ms. Price sent Mr. Soptich a revised version of the memorandum on the evening of January 21, 2014, in which the references to H&H Furniture were moved to the beginning of the discussion of "occupancies with violations." ECF No. 24-25 at 4. The revised version contained an additional paragraph: "Due to H&H Furniture's uncooperative nature, the City will now go and seek an administrative warrant in order to conduct a detailed description." *Id.* Mr. O'Rourke recalled at deposition that he had advised Mr. Soptich, City Attorney Jeff Cutter, and Mr. Kunkler to get an administrative warrant, although the record does not indicate the

timing of that advice.  *See* ECF No. 19-1 at 104−06.  It is undisputed that no one obtained an administrative warrant to search H&H Furniture.  *See* ECF No. 19-1 at 104.

At a weekly senior staff meeting with Mr. O'Rourke on January 29, 2014, Mr. O'Rourke included "H&H Furniture" as an agenda item.  ECF Nos. 24-4 at 7, 16; 25-16 at 2.  Senior staff generally included department heads, including the fire chief and the city attorney.  ECF No. 25-6 at 42.  Ms. Price emailed Mr. O'Rourke the following summary of the discussion of H&H Furniture at the meeting: "according to legal, a warrant is not needed to go in H&H Furniture for the re-inspection (scheduled 1/31) . . . Fire will work with legal and codes[.]"  ECF No. 25-17 at 2.

On January 31, 2014, at approximately 9:30 a.m., Mr. Doan returned with Mr. Heath to H&H Furniture to perform a compliance re-inspection.  ECF No. 24-13 at 9−10.  According to Mr. Doan, a receptionist told the inspectors that Mr. Peterson would be in the store around 11:00 a.m.  *Id.*  They left and returned at 11:00 a.m., when, according to Mr. Doan, the receptionist told them to make an appointment for the next week.  *Id.*  Mr. Doan gave the receptionist a letter to give to Mr. Peterson, stating:

> I am here today to complete a compliance Inspection that is due as of today the 31st of January. On November 19th I delivered a letter explaining the requirements that were to be met by todays [sic] date. Please see letter dated November 18, 2013 attached with this letter.

ECF No. 24-13 at 19.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 24

Mr. Peterson wrote an email to Doan on January 31, 2014. ECF No. 19-1 at

32. In the email, Mr. Peterson wrote, in part:

> It came as a sad surprise to me that you showed up at my main store today, unannounced.
> Perhaps you forgot that I sent you an email earlier, asking that you exhibit the professionalism that others extend when they wish to speak to me; make an appointment. . . .

ECF No. 24-13 at 10. The email further characterized Mr. Doan as unprepared

during the initial inspection and Mr. Doan's attitude as "bullying." *Id.* at

10−11.

### *Criminal Charge*

Ms. Martinez recalls first hearing that "Mr. Peterson had refused to allow the

inspection of his business" at a meeting with Mr. Kunkler. ECF No. 24-5 at 9. Ms.

Martinez further recalled Mr. Kunkler telling her that "Tony would like to pursue the

charge." *Id.* at 9−10. Ms. Martinez testified that she was unsure whether the

"Tony" in Mr. Kunkler's statement referred to Mr. O'Rourke or Mr. Doan. *Id.*

Mr. Doan prepared a document signed and dated February 4, 2014,

summarizing the history of inspections and attempted re-inspections at H&H

Furniture from November 5, 2013, through January 2014. ECF No. 24-13 at 3−4.

Mr. Doan certified the truth of his statement under penalty of perjury. *Id.* at 4. Mr.

Doan worked with then-Deputy Prosecutor Andrew Reinen to prepare the statement

and assemble the packet of related documents in which the statement was included.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 25

ECF No. 24-2 at 12–14.  Mr. Doan testified that he believes Mr. Reinen reached out to him.  *Id.* at 14.  Mr. Doan does not remember whether he prepared the packet relating to the H&H Furniture inspections at his office, the legal office, or at City Hall.  *Id.*

Also on February 3, 2014, Ms. Price emailed Mr. Soptich and Mr. Caruso asking for "a copy of the 2002 fire inspection" and, in a separate email, asking for "a copy of the email Mark Peterson accidentally sent to the City[.]"  ECF Nos. 25-21 at 2; 25-22 at 2.  Ms. Price recalled that the request for the 2002 fire inspection "would have been for Tony O'Rourke," and the copy of the email from Mr. Peterson also was at Mr. O'Rourke's request.  ECF No. 24-6 at 5.

Ms. Martinez testified that she did not do any legal research to verify that Mr. Peterson's actions amounted to preventing an inspection prior to charging Mr. Peterson and instead reviewed the reports that she received.  ECF No. 42-7 at 4.  Ms. Martinez further testified that Mr. Reinen was not assigned to Mr. Peterson's prosecution until the arraignment.  *Id.*

On February 10, 2014, Ms. Martinez generated and signed a criminal complaint alleging that Mr. Peterson committed the misdemeanor offense "Violation of Fire Code—YMC 10.05.025(H)" "[o]n or about January 31st, 2014 . . . by refusing to allow the code administration manager or any of his/her authorized representatives [sic] enter to inspect the premises at 213 West Yakima Avenue,

H&H Furniture." ECF No. 19-1 at 238; *see also* ECF No. 2-3 at 20.  Ms. Martinez

informed Mr. O'Rourke by email that the complaint would be filed that afternoon.

ECF No. 19-1 at 118.

After the arraignment the City offered Mr. Peterson a plea agreement.  ECF

No. 42-7 at 7.  However, the agreement included jail time for Mr. Peterson,

premised on a prior criminal conviction or disqualifying citation.  *Id.*  Mr. Peterson

asserts that his business was never cited, charged, or convicted before February

2014.  ECF No. 26 at 3.

Ms. Martinez testified that Mr. O'Rourke "occasionally" would ask about the

prosecution against Mr. Peterson.  ECF No. 42-7 at 6.[5]  Ms. Martinez recalled that in

conjunction with asking about the case, Mr. O'Rourke made comments about Mr.

Peterson that were "not complimentary."  *Id.*  She did not recall Mr. O'Rourke

asking about other cases.  *Id.*

On April 7, 2014, Ms. Price, emailed Ms. Martinez, with simply "Mark

Peterson" in the subject line, asking: "Do you know which judge was assigned to his

---

[5] The Court notes that Plaintiff cited to portions of Ms. Martinez's deposition
transcript that were not submitted with Plaintiff's Motion for Partial Summary
Judgment, ECF No. 22.  However, Plaintiff submitted additional portions of Ms.
Martinez's deposition along with the reply brief.  ECF Nos. 40, 42, and 42-7.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 27

criminal hearing scheduled for this Wednesday?"  ECF Nos. 24-4 at 19; 24-6 at 6.[6]

Ms. Martinez recalled that she found Ms. Price's inquiry "odd" and out of the

ordinary.  ECF No. 42-7 at 7.  Ms. Martinez understood Ms. Price to be inquiring

not out of her own interest, but on behalf of Mr. O'Rourke.  *Id.*

Mr. O'Rourke offers an alternative explanation for his interest in the charges

against Mr. Peterson.  Mr. O'Rourke recalls communicating to the City Council,

soon after he started working as City Manager, his opinion that the City's

elimination of the fire inspection program for some period of time during the

recession was "ridiculous[.]"  ECF No. 19-1 at 100.  The City revived its fire

inspection program "within the first year" of Mr. O'Rourke's work as City Manager.

*Id.* at 101.

On October 30, 2014, Mr. Peterson filed a "Second Motion Seeking Order of

Dismissal" with the Yakima Municipal Court.  ECF No. 2-3 at 24.  On November

26, 2014, the Municipal Court dismissed the criminal matter with prejudice, on the

prosecutor's motion, in the "interest of justice."  ECF No. 2-3 at 22; *see also* ECF

No. 42-7 at 8.

---

[6] Plaintiff cites to a non-existent exhibit in support of the relevant statement of fact. ECF No. 23 at 66.  Nevertheless, the language of this purported email is included in deposition transcripts, as cited.

Following dismissal of the charge, Ms. Martinez wrote a memorandum to City

Attorney Mr. Cutter dated December 2, 2014.  She explained:

> On February 10, 2014, the City of Yakima filed charges against Mark Peterson alleging that he violated the Fire Code.  It is a criminal offense under the Fire Code to:
>
>> refuse, fail or neglect to promptly permit entry to inspect a building by the Yakima Code Administration Manager or the manager's authorized representative; when the Yakima Code Administration Manager or his authorized representative has reasonable cause to believe that there existed a condition in violation of the fire code making the building unsafe, or inspection was necessary to enforce the provisions of the fire code;
>
> Prosecutor Andrew Reinen spent many hours preparing for trial. Code Violation prosecutions, typically take more time that [sic] the average criminal case.  On October 30, 2015, the defense filed a second motion to dismiss. Attached. The City researched the law and filed a response (also attached), but there was ultimately no argument to be made regarding the inspection of private spaces. Mr. Peterson had a right to refuse the inspection of private spaces and because he has that right, refusing inspection of private spaces, can't result in criminal charges.
>
> The Code Inspector, who wasn't aware of the distinction, did not make it clear that he wanted to inspect public spaces only. *See* motion to dismiss attached.  We considered continuing the case on a public spaces only theory, but we don't have a "clear" refusal to allow inspection of the public spaces only and it is nearly impossible to obtain a conviction with muddy facts.  If somehow we obtained a conviction, we would not survive appeal.  Ultimately, I concluded that justice would not be served by continuing this prosecution.
>
> This case has been a learning experience for the fire code inspector and our office. We are planning a Codes training session to reinforce lessons learned.

ECF No. 25-32 at 2.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 29

*Post-Prosecution Developments*

In a letter dated November 22, 2016, Mr. Soptich sent Mr. Peterson a letter noting that an August 16, 2016 fire inspection uncovered the same conditions in the basement showroom that had been raised in the "November 18, 2013" letter and the 2002 letter from Ms. Valladares. ECF No. 24-27 at 2. The November 22, 2016 letter required Mr. Peterson to inform the City of which of three possible options he would be undertaking to mitigate the risk, "[i]n order to continue to use the basement as a showroom." *Id.* However, Mr. Cutter informed Mr. Peterson by letter dated January 6, 2017, that the City was "not mandating that [Mr. Peterson] make any of the corrective options." ECF No. 24-8 at 2−3 (with the second page of the letter dated "January 6, 2016"). Rather, the City was "trusting that [Mr. Peterson's] own concern for the safety of [his] customers and employees will lead to installation of one or more of the options." *Id.* at 2. Mr. Cutter ended the correspondence with: "Please know that the City of Yakima reserves all authorized means to enforce its life safety codes in any necessary circumstance." *Id.* at 3. The record indicates that Mr. O'Rourke left the City Manager position since 2014, but the date of his departure is unclear. *See* ECF No. 32-5 at 4. It is also unclear whether Mr. Doan remained in his role past 2014.

///

///

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 30

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323. If the moving party meets this challenge, the burden shifts to the nonmoving party to "set out specific facts showing a genuine issue for trial." *Id.* at 324 (internal quotations omitted). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). In deciding a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 631–32 (9th Cir. 1987). Courts evaluate cross-motions for summary judgment separately under the same standard. *Am. Civil Liberties Union of Nev. v.*

*City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). If the non-movant's opposition fails to cite specifically to evidentiary materials, the Court need not search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028−29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417−18 (9th Cir. 1988).

## DISCUSSION

### *42 U.S.C. § 1983 Standard*

Section 1983 creates a cause of action against any person who, acting under color of state law, abridges rights established by the Constitution or laws of the United States. *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1056 (9th Cir. 2002). To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Alford v. Haner*, 333 F.3d 972, 975 (9th Cir. 2003).

### *Liability for the City of Yakima*

Plaintiff alleges in his Amended Complaint that the City of Yakima retaliated against Plaintiff for engaging in protected free speech activities "through the joint, coordinated, and intentional acts of Defendants O'Rourke, Soptich, and Doan[.]"

ECF No. 1-2 at 13.  Plaintiff further alleges that the City and the individual Defendants "continue to embark on a retaliatory course of conduct evidenced most recently by the City's October 2016 inspection of H&H Furniture and the City's refusal to clear Mr. Peterson of any and all fire code related wrongdoing (as it relates to H&H's basement ceiling) as shown by Mr. Cutter's January 6, 2017 letter."  *Id.*

Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort.  *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978).  However, a city is not vicariously liable for the unconstitutional acts of its employees under the theory of respondeat superior.  *Id.* at 691.

A plaintiff may establish local government liability under section 1983 "only if a local government's own official policy or custom caused the deprivation of federal rights."  *United States v. Cty. of Maricopa*, 889 F.3d 648, 652 (9th Cir. 2018) (citing *Monell*, 436 U.S. at 690).  The "'official policy' requirement is intended to ensure that a municipality's liability 'is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered.'"  *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).

The Ninth Circuit has found municipal liability on the basis of ratification "when the officials involved adopted and expressly approved of the acts of others

who caused the constitutional violation." *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *reversed in part on other grounds*, 135 S. Ct. 1765 (2015).  Policymaker liability must be shown through the acts of officials who have "'final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.'"  *Cty. of Maricopa*, 889 F.3d at 652 (quoting *McMillian v. Monroe Cty.*, 520 U.S. 781, 784−85 (1997)).  Policymaking officials may be the government's legislative body or officials "'whose edicts or acts may fairly be said to represent official policy.'"  *Id.* (quoting *Monell*, 436 U.S. at 694).

### *Individual Liability under 42 U.S.C. § 1983*

Suits under section 1983 against government officials in their individual capacities "seek to impose personal liability upon a government official for actions he takes under color of state law."  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  Individual liability may be founded upon a variety of bases.  A person may be individually liable through direct personal participation in the deprivation of a constitutional right, or by "'setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'"  *Crowe v. County of San Diego*, 608 F.3d 406, 430 (9th Cir. 2010) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743−44 (9th Cir. 1978)).  For a supervisory official, liability also attaches to "his acquiescence in the constitutional

deprivation" or "conduct that showed a reckless or callous indifference to the rights of others." *Keates v. Koile*, 883 F.3d 1228, 1243 (9th Cir. 2018).

Moreover, a section 1983 defendant may be liable for "integral participation" in a constitutional violation "even if the actions of each defendant do not 'rise to the level of a constitutional violation.'" *Keates*, 883 F.3d at 1241 (quoting *Boyd v. Benton Cty.*, 374 F.3d 773, 780 (9th Cir. 2004)). The Ninth Circuit has found defendants to be integral participants where, for instance, only one officer threw a flash-bang device into an apartment prior to a search, but "the use of the flash-bang was part of the search operation in which every officer participated in some meaningful way[,]" and "every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed." *Boyd*, 374 F.3d at 780. By contrast, the Ninth Circuit found that defendants were not integral participants where there was no evidence that the police officers were "privy to any discussions, briefings or collective decisions" made by the state agency that determined that children were to be removed from their parents' custody with the officers' participation. *Sjurset v. Button*, 810 F.3d 609, 619 (9th Cir. 2015).

### *Qualified Immunity*

The doctrine of qualified immunity shields government actors from civil liability under 42 U.S.C. § 1983 if "their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has set forth a "two-step sequence for resolving government officials' qualified immunity claims." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." *Id.* "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.*

The Supreme Court has emphasized that the qualified immunity standard sets a low bar, explaining that "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). "When properly applied," qualified immunity shields from liability "all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743.

### First Amendment Retaliation

The First Amendment "'prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). A plaintiff must show "that (1) [h]e was engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary

firmness from continuing to engage in the protected activity, and (3) the protected

activity was a substantial or motivating factor in the defendant's conduct." *O'Brien*

*v. Welty*, 818 F.3d 920, 932 (9th Cir. 2016).  A defendant's intent to inhibit speech in

the third element may be demonstrated "either through direct or circumstantial

evidence." *See Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300−01

(9th Cir. 1999).

<u>Violation of a Constitutional Right</u>

In the Amended Complaint, Plaintiff bases his First Amendment retaliation

claim on two allegedly retaliatory actions: (1) the misdemeanor criminal prosecution

beginning in February 2014, and the preceding events; and (2) the City's October

2016 inspection of the H&H Furniture premises and the City's "refusal to clear Mr.

Peterson of any and all fire code related wrongdoing" relating to the basement

ceiling and its lack of one-hour fire resistive construction.  ECF No. 1-2 at 13.  The

parties address only the first series of allegedly retaliatory actions in the summary

judgment briefing.

**Constitutionally Protected Activity**

The Supreme Court has recognized that "the law is settled that as a general

matter the First Amendment prohibits government officials from subjecting an

individual to retaliatory actions, including criminal prosecutions, for speaking out."

*Hartman v. Moore*, 547 U.S. 250, 256 (2006).  "While an individual's critical

comments may be 'provocative and challenging,' they are 'nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest.'" *Ford v. City of Yakima*, 706 F.3d 1188, 1192−93 (9th Cir. 2013) (per curiam) (quoting *City of Houston v. Hill*, 482 U.S. 451, 461 (1987)), *abrogated on other grounds by Nieves*, 139 S. Ct. 1715.

There is no factual dispute that Mr. Peterson's commentary against the master plan and plaza proposals constitutes protected speech. *See Mendocino Envtl. Ctr.*, 192 F.3d 1283 (police officers sued for First Amendment retaliation and conspiracy to falsely accuse political activists of a crime in an effort to inhibit their political activities); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (observing that the plaintiff had a protected interest in commenting on the actions of government officials).

### Chilling Effect

The next inquiry is whether the retaliation that Plaintiff alleges would chill a person of ordinary firmness from continuing to engage in the protected activity. *Capp v. City of San Diego*, 940 F.3d 1046, 1054 (9th Cir. 2019). The test is "'generic and objective.'" *Id.* (quoting *O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016)). In this case, Mr. Peterson alleges that the City subjected him to heightened scrutiny of whether he complied with the fire code and pursued criminal prosecution

of him because of his critical comments. The threat of criminal penalties, in addition to the threat of jail time, for a business owner who has cultivated a public presence in a relatively small community is a severe consequence that naturally would chill the average person from continuing to express opposition to City initiatives. Therefore, the Court finds that the alleged retaliation objectively would have had a chilling effect.

### Substantial or Motivating Factor

The Supreme Court has recognized that "proving the link between the defendant's retaliatory animus and the plaintiff's injury . . . 'is usually more complex than it is in other retaliation cases.'" *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1953 (2018) (quoting *Hartman*, 547 U.S. at 261). "Unlike most retaliation cases, in retaliatory prosecution cases the official with the malicious motive does not carry out the retaliatory action himself—the decision to bring charges is instead made by a prosecutor, who is generally immune from suit and whose decisions receive a presumption of regularity." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1723 (2019) (citing *Lozman*, 138 S. Ct. at 1953).

The Supreme Court recently has defined the significance of probable cause to a retaliatory prosecution claim as follows:

> If there was probable cause, the case ends. If the plaintiff proves the absence of probable cause, then the *Mt. Healthy* test governs: The plaintiff must show that the retaliation was a substantial or motivating factor behind the prosecution, and, if that showing is made, the

defendant can prevail only by showing that the prosecution would have been initiated without respect to retaliation.

*Lozman*, 138 S. Ct. at 1952.[7]

Although the Supreme Court has characterized the concept of probable cause as being "incapable of precise definition," the "'substance of all the definitions of probable cause is a reasonable ground for belief of guilt.'" *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). The probable cause standard aims to "protect[] 'citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime,' while giving 'fair leeway for enforcing the law in the community's protection.'" *Id.* (quoting *Brinegar*, 338 U.S. at 176).

As evidenced by the City's motion to dismiss the charges against Mr. Peterson with prejudice and Ms. Martinez's post-dismissal memorandum, the City itself recognized that there was no probable cause to bring the misdemeanor charge because Plaintiff "had a right to refuse the inspection of private spaces." ECF No. 25-32 at 2. Therefore, the Court proceeds to

---

[7] In *Mt. Healthy*, the Supreme Court held that the government could not take adverse employment action against a government employee if the action is in response to the employee's "exercise of constitutionally protected First Amendment freedoms." *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 283−84 (1977).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 40

consider whether Mr. Peterson's protected speech was a substantial or motivating factor for the City's prosecution of him.  *See Lozman*, 138 S. Ct. at 1952.

Plaintiff provided circumstantial evidence that he had a reputation among City officials for being outspoken regarding City actions and proposals.  ECF Nos. 25-26 at 17 (Mr. Hawkins recalling that he "felt embarrassed" by Mr. Peterson's commentary at a public meeting and that he told a new business person that Mr. Peterson's opinions were "not reflective of the whole . . . of the opinions downtown"); 25-6 (email from a Yakima Police Captain describing an inquiry from Plaintiff as "[p]retty typical behavior for Mark Peterson"); 24-4 at 10 (Mr. O'Rourke recalling that Mr. Peterson asked questions at the November 5, 2013 informal meeting and City Council hearing).  There is evidence that Mr. Doan, with the assent of Mr. O'Rourke and Mr. Soptich, moved forward with reporting Mr. Peterson as non-compliant with the fire code re-inspection when Mr. Doan had never informed Mr. Peterson that he only intended to inspect the public spaces of the premises or scheduling a time to inspect the entire premises in Plaintiff's presence.  *See* ECF Nos. 24-13 at 6; 25-32 at 2; and 24-25 at 4.  Likewise, there is evidence that Mr. Doan, with involvement from Mr. Soptich and awareness of Mr. O'Rourke, shifted course after the initial November 5, 2013 inspection report and required installation of a one-hour separation within approximately ninety days without investigating

whether that requirement and timeframe were reasonable or necessary. *See* ECF Nos. 24-2 at 5, 7; 24-7 at 5.

Plaintiff also provided circumstantial evidence that the individual Defendants and the City expressed an animus against him. *See* ECF Nos. 24-9 at 2 (November 6, 2013 email from Mr. Soptich to Mr. Doan forwarding an unsigned fire inspection document from eleven years prior and adding: "Knowledge is power. Get with me."); 25-26 at 25 (Mr. Hawkins recalling that he emailed Mr. O'Rourke to recommend against including Mr. Peterson in a master plan implementation committee because "[h]e will be difficult"); 24-13 at 10 (Mr. Peterson describing Mr. Doan's attitude as "bullying"); and 42-7 at 6 (Ms. Martinez recalling Mr. O'Rourke making comments about Mr. Peterson that were "not complimentary"). In addition, there is evidence that Mr. O'Rourke's interest in the fire code investigation and subsequent prosecution of Mr. Peterson was uncommon. ECF No. 42-7 at 6 (Ms. Martinez recalling Mr. O'Rourke asking periodically about the prosecution against Mr. Peterson, which she did not recall Mr. O'Rourke doing in other cases).

Consequently, through a combination of direct and circumstantial evidence, Plaintiff has established a genuine issue of fact as to the personal involvement of Defendants O'Rourke, Soptich, and Doan in the prosecution of the alleged violation and as to whether those actions were orchestrated by a final policymaker for the

City, specifically Mr. O'Rourke. First, the protected speech was close in time to all of the events preceding the prosecution, from which a jury "'logically could infer'" a retaliatory motive. *See Keyser v. Sacramento City Unified School Dist.*, 265 F.3d 741, 751 (9th Cir. 2001) (quoting *Schwartzman v. Valenzuela*, 846 F.2d 1209, 1212 (9th Cir. 1988)). Mr. O'Rourke also knew of Mr. Peterson's protected speech. ECF No. 24-4 at 10. Second, there are numerous exchanges among Defendants and other City employees supporting that the proffered reasons for ultimately filing a criminal charge against Plaintiff were false and pretextual. *See Keyser*, 265 F.3d at 751−52.

Therefore, as to individual liability, each individual Defendant played a role in "'setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" *Crowe*, 608 F.3d at 430 (quoting *Johnson*, 588 F.2d at 743−44). Mr. O'Rourke's conduct, depending on a factfinder's credibility determinations, may support a finding that he acquiesced in or showed a reckless or callous indifference to a First Amendment constitutional violation. *Keates*, 883 F.3d at 1243. Moreover, there is a genuine issue of material fact as to whether the individual Defendants were all integral participants in a constitutional violation "even if the actions of each defendant do not 'rise to the level of a constitutional violation.'" *Keates*, 883 F.3d at 1241 (quoting *Boyd*, 374 F.3d at 780).

As to municipal liability, the evidence regarding Mr. O'Rourke's awareness and approval of the fire inspection process and criminal prosecution create a genuine issue of material fact as to whether "the officials involved adopted and expressly approved of the acts of others who caused the constitutional violation." *Sheehan*, 743 F.3d at 1231. Viewing the evidence in the light most favorable to Mr. Peterson as the nonmoving party in the Defendant's motion for summary judgment, the Court finds that Plaintiff has demonstrated a question of fact as to whether retaliation was a substantial or motivating factor behind the prosecution.

By contrast, shifting to Plaintiff's Motion for Partial Summary Judgment and viewing the evidence in the light most favorable to Defendants, evidence in the record also supports that the individual Defendants and the City simply were attempting to mitigate an identified fire threat when they revisited Mr. Peterson's place of business and filed a complaint against him for failure to comply with the fire code. *See House v. Bell*, 547 U.S. 518, 559–60 (2006) (at summary judgment, a court "does not assess credibility or weigh evidence, but simply determines whether there is a genuine factual issue for trial.").

Having found genuine issues of material fact regarding Plaintiff's First Amendment retaliation claim and a legally cognizable claim of a constitutional violation, the Court considers whether the individual Defendants nevertheless are entitled to qualified immunity as a matter of law under the second prong of the

qualified immunity analysis, whether the constitutional right was clearly established at the time of Defendants' alleged misconduct. *See Pearson*, 555 U.S. at 232.

<u>Clearly Established</u>

Plaintiff points to the Ninth Circuit Court of Appeals' decision in *Ford*, 706 F.3d 1188 to assert that the City of Yakima, and its counsel "have *actual knowledge* that First Amendment Retaliation is prohibited under the constitution." ECF No. 30 at 4. Defendants do not address *Ford* in their reply. *See* ECF No. 38.

In *Ford*, issued on February 8, 2013, the Ninth Circuit held that Circuit law gave fair notice "at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech." 706 F.3d 1188, at 1195. *Ford* was a retaliatory arrest decision that was recently abrogated by the Supreme Court's decision in *Nieves* to the extent that *Ford* had held that a plaintiff could succeed on a First Amendment retaliatory arrest claim even where probable cause for arrest was present. 139 S. Ct. at 1723, 1725. *Nieves* held that a plaintiff's claim of retaliatory arrest fails unless he pleads and proves the absence of probable cause for the underlying criminal charge. *Nieves*, 139 S. Ct. at 1723, 1725. Nonetheless, *Nieves* did not disturb the Ninth Circuit's finding on the second prong of the qualified immunity analysis that officials had fair notice that they could not use their authority to retaliate for engaging in protected speech. *See id.*; *Ford*, 706 F.3d at 1195. Likewise, caselaw clearly establishes that intentionally enabling an arrest or

prosecution without probable cause to chill a person's political speech violates the First Amendment. *See Beck v. City of Upland*, 527 F.3d 853, 863−64, 871 (9th Cir. 2008); *Mendocino Envtl. Ctr.*, 192 F.3d at 1300.

The Court finds that the First Amendment constitutional violation that Plaintiff asserts for his section 1983 claim was clearly established at the time of the alleged violation in 2013 and 2014. Therefore, the Court finds that qualified immunity is unavailable to Defendants on the First Amendment retaliation claim.

Having found that a factfinder reasonably could infer from the materials in the summary judgment record that all Defendants' acts would chill a person of ordinary firmness from future First Amendment activities, and that there is a material question of fact as to whether Plaintiff would have been prosecuted "but for" Defendants' retaliatory animus, the Court denies summary judgment to Plaintiff and Defendants on the First Amendment retaliation claim. This claim is appropriate for a jury to decide.

### Fourth Amendment Claims

Plaintiff raises Fourth Amendment claims for malicious prosecution and "retaliation." *See* ECF No. 1-2 at 13−15. The premise of Plaintiff's Fourth Amendment retaliation claim is that Defendants allegedly violated Plaintiff's Fourth Amendment rights by retaliating against him for asserting his Fourth Amendment right to be free from unreasonable searches when he requested an appointment to

ensure that he would be present for a search that might include private spaces of the business. *Id.* at 15.

With respect to Fourth Amendment malicious prosecution, Defendants assert that there is no evidence that Mr. Doan gave false information or made material omissions to Ms. Martinez. ECF No. 17 at 6. Defendants further argue that Plaintiff must present information in addition to his own account to rebut the presumption that Ms. Martinez exercised her independent prosecutorial judgment in filing the charge against Plaintiff. *Id.* (citing *Newman v. Cty. of Orange*, 457 F.3d 991, 994−95 (9th Cir. 2006). Plaintiff responds that Defendants knew that there was no probable cause to charge Plaintiff with a crime. ECF No. 30 at 13 (citing to Plaintiff's Statement of Material Facts). Plaintiff further argues that since "the criminal prosecution was brought in furtherance of Defendants' coordinated attempts to deny Mr. Peterson his First Amendment rights, a cognizable claim exists." *Id.*

Defendants argue that Plaintiff's Fourth Amendment retaliation claim should be dismissed because there is no such cause of action. ECF No. 17 at 9. Defendants further argue that there was no illegal search or seizure of Plaintiff or his property, and Plaintiff, "as either a landlord to H&H or a shareholder in H&H, has no Fourth Amendment rights in the physical premises in the first place." *Id.* (without citation to authority). Plaintiff responds, without citation to authority, that Plaintiff has a

Fourth Amendment right in his place of business, and Plaintiff was entitled to refuse admission to a fire code enforcement officer to search the premises without a warrant. ECF No. 30 at 14−15.

The Fourth Amendment protects persons against "unreasonable searches and seizures." U.S. Const. amend. IV. It "applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). "'A person is seized' whenever officials 'restrain[ ] his freedom of movement' such that he is 'not free to leave[.]'" *Manuel v. City of Joliet*, 137 S. Ct. 911, 917 (2017) (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007)). An arrest or detention without probable cause violates the Fourth Amendment. *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1076 (9th Cir. 2011).

With respect to qualified immunity for the individual Defendants, Plaintiff bears the burden of showing "that the contours of the right were clearly established." *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1109 (9th Cir. 2011); *see also al-Kidd*, 563 U.S. at 735 (noting that "courts have discretion to decide which of the two prongs of the qualified-immunity analysis to tackle first."). "For federal law to be clearly established, there must be fairly close factual correspondence between the prior precedents and the case at hand." Martin A. Schwartz, Fed. Judicial Ctr. *Section 1983 Litigation* 147 (3d ed. 2014).

1    The starting point for a claim of Fourth Amendment malicious prosecution is

2 that there is a seizure.  *Manuel*, 137 S. Ct. at 914 (holding that "[i]f the complaint is

3 that a form of legal process resulted in pretrial detention unsupported by probable

4 cause, then the right allegedly infringed lies in the Fourth Amendment.").  Plaintiff

5 cites only to *Manuel*, 137 S. Ct. at 914, to argue that he can assert a claim for

6 wrongful prosecution under the Fourth Amendment.  ECF No. 30 at 12.

7    It is undisputed that Mr. Peterson did not spend any time in jail, although Mr.

8 Peterson has maintained that the plea agreements that were presented to him before

9 his criminal charge was dismissed all insisted that he spend at least one night

10 incarcerated.  *See* ECF No. 42-7 at 7.  Since there is no restraint against Mr.

11 Peterson's freedom of movement in this record, the Court finds that there is no

12 clearly established law that gave the state officials fair notice that the Fourth

13 Amendment prohibited the conduct that Plaintiff challenges.

14    As for Plaintiff's Fourth Amendment claim based on retaliation, Plaintiff does

15 not cite any authority supporting that the Fourth Amendment protects persons from

16 retaliation for asserting a Fourth Amendment right.  *See* ECF No. 30 at 15−16.  The

17 Supreme Court has observed that "a general constitutional rule already identified in

18 the decisional law may apply with obvious clarity to specific conduct in question,

19 even though the very action in question has not previously been held unlawful."

20 *United States v. Lanier*, 520 U.S. 259, 271 (1997).  However, "this obviousness

21

principle, an exception to the specific-case requirement, is especially problematic in the Fourth-Amendment context." *Sharp v. City of Orange*, 871 F.3d 901, 911−12 (9th Cir. 2017).

Again, even if the Court were to find that there is a constitutional violation based on Fourth Amendment retaliation, the ambiguity of the law supports that the individual Defendants are shielded from liability, because there is no caselaw that clearly establishes that Defendants are prohibited from acting in this fashion. Moreover, there is no indication in the summary judgment briefing that this is "'one of those rare cases' in which a violation was so 'obvious' that qualified immunity does not apply 'even without a case directly on point.'" *Sharp*, 871 F.3d at 912.

Liability for the City is also foreclosed as a matter of law with respect to Plaintiff's Fourth Amendment claims. Again, there is no qualifying seizure for Fourth Amendment malicious prosecution. *See Manuel*, 137 S. Ct. at 914; *see also Karam v. City of Burbank*, 352 F.3d 1188, 1193−94 (9th Cir. 2003) (where plaintiff was falsely accused of a misdemeanor and required to sign an "own recognizance" agreement compelling plaintiff's presence in court and requiring court permission to leave the state, restrictions were de minimis and did not constitute a Fourth Amendment seizure); *Becker v. Kroll*, 494 F.3d 904, 915 (10th Cir. 2007) (holding that a "groundless charging decision may abuse the criminal process, but it does not, in and of itself, violate the Fourth Amendment absent a significant restriction on

liberty."). Nor is there any factual support for a theory that the City had a policy or practice of retaliating against Plaintiff for asserting his Fourth Amendment rights regarding a search of the H&H Furniture premises. Rather, the record is replete with references to the alleged policymaker, Mr. O'Rourke, directing other officials to obtain an administrative warrant to search the premises. *See* ECF Nos. 24-25 at 4; 19-1 at 104−06.

There is no support for a finding that the City, through a policymaker such as Mr. O'Rourke, expressly approved of conducting a search without a warrant or of retaliating against Plaintiff for resisting a warrantless search of his premises. *See Sheehan*, 743 F.3d at 1231. Therefore, the Court finds that Plaintiff's Fourth Amendment claims are appropriately resolved in Defendants' favor at summary judgment. Even if a reviewing court were to reinstate Plaintiff's Fourth Amendment claims, the Court finds that the individual Defendants are entitled to qualified immunity because there is no clearly established authority prohibiting their actions.

### *Fourteenth Amendment Due Process*

Defendants argue that Plaintiff fails to articulate any constitutionally protected liberty or property interest of which he was deprived either when the City charged him or when the City did not obtain a warrant to search his business. ECF No. 17 at 10. In addition, Defendants argue that the individual defendants "had no hand in dictating the process afforded" to Plaintiff. *Id.* Plaintiff argues that the evidence, if

a jury believes Mr. O'Rourke, supports that Defendants Soptich and Doan "*knew*

they could not charge Mr. Peterson without the warrant and proceeded with the

investigation anyway, which would constitute a violation of Mr. Peterson's

Fourteenth Amendment rights." ECF No. 30 at 17 (emphasis in original).

The Supreme Court has held that there is no "substantive right under the Due

Process Clause of the Fourteenth Amendment to be free from criminal prosecution

except under probable cause." *Albright v. Oliver*, 510 U.S. 266, 268 (1994)

(plurality opinion). Furthermore, "[w]here a particular Amendment 'provides an

explicit textual source of constitutional protection' against a particular sort of

government behavior, 'that Amendment, not the more generalized notion of

'substantive due process,' must be the guide for analyzing these claims.'" *Albright*,

510 U.S. at 273 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

Given that the Court already has found that Plaintiff may seek a remedy for

the alleged official misconduct under the First Amendment, Plaintiff's more

generalized claim under the Fourteenth Amendment fails as a matter of law. *See*

*Albright*, 510 U.S. at 268.

Moreover, qualified immunity bars Plaintiff's Fourteenth Amendment claim

for the individual Defendants, and the City is not liable under *Monell*, 436 U.S. at

690. Plaintiff has not set forth any legal support for a clearly established right that

would have put Defendants on notice as to prohibited conduct. *See* ECF No. 30 at

16−17. Nor has Plaintiff stated a cognizable theory of how the acts of any official with final policymaking authority resulted in a Fourteenth Amendment violation. *See Cty. of Maricopa*, 889 F.3d at 652.

Therefore, the Court grants Defendants' summary judgment motion for disposition of Plaintiff's Fourteenth Amendment claim.

### *Washington State Malicious Prosecution*

Plaintiff alleges a claim of malicious prosecution under state law. Under Washington law, a malicious prosecution claim has five elements: "(1) the defendant instituted or continued a prosecution against the plaintiff; (2) without probable cause; (3) with malice; (4) the prosecution terminated in the plaintiff's favor; and (5) the plaintiff was injured or damaged as a result of the prosecution." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1099 (9th Cir. 2013).

Defendants argue that Plaintiff's state law malicious prosecution claim fails because the prosecutor, Ms. Martinez, used her independent judgment in deciding to prosecute Mr. Peterson, with any information from Mr. Doan provided through written, factual statements compiled with the assistance "of other city attorneys." ECF No. 17 at 7. "Neither Mr. O'Rourke nor Deputy Chief Soptich had any involvement in her decision to initiate prosecution." *Id.* Defendants also argue that the record lacks evidence of malicious purpose behind the prosecution. *Id.* at 8.

Plaintiff responds that the evidence supports that all three individual Defendants "instituted, furthered, supported, and continued the prosecution" of Plaintiff. ECF No. 30 at 14. Plaintiff asserts that "there was no probable cause to charge Mr. Peterson with a crime as no warrant was obtained." *Id.*

The Court already concluded for purposes of the First Amendment retaliation claim that the City lacked probable cause to support the misdemeanor charge of violating the fire code by refusing inspection. Likewise, the City's motion for dismissal with prejudice and post-dismissal memorandum support that the facts and circumstances within Mr. Doan's and Mr. Soptich's knowledge were insufficient to "warrant a man of reasonable caution in a belief that an offense has been . . . committed." *Bender v. Seattle*, 99 Wn.2d 582, 597 (1983) (articulating objective standard for probable cause under Washington law); *see* ECF No. 25-32 at 2.

The Court further found evidence in the record of improper motive or reckless indifference to the rights of others, in the form of Mr. O'Rourke's involvement in the case and the coordination among the individual Defendants. *See Keates*, 883 F.3d at 1243. Moreover, Plaintiff offered evidence that he was damaged as a result of the prosecution, in the form of damage to his business and emotional distress. *See* ECF No. 24-1 at 5. Lastly, it is undisputed that the prosecution terminated in Plaintiff's favor. Therefore, the Court denies Defendants' motion for summary judgment with respect to Plaintiff's state law malicious prosecution claim.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 54

### *Common Law Civil Conspiracy*

Plaintiff alleges that the "evidence of conspiracy is mammoth," in this matter, including the "investigation events" on November 5, 2013, the "retaliatory events" beginning on November 12, 2013, and the "December 29, 2013" senior staff meeting[8], and the communication immediately preceding the "rushed prosecution on February 10." *See* ECF No. 30 at 19−20. Defendants respond that these facts do not show collaboration among the three individual Defendants. *See* ECF No. 38 at 9−10.

A plaintiff claiming conspiracy "must demonstrate the existence of 'an agreement or meeting of the minds to violate constitutional rights.'" *Mendocino Envtl. Ctr.*, 192 F.3d at 1301 (quoting *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1540−41 (9th Cir. 1989) (en banc) (internal quotation omitted)). "Whether defendants were involved in an unlawful conspiracy is generally a factual issue and should be resolved by the jury, 'so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reach an understanding to achieve the conspiracy's objectives.'" *Id.* (quoting *Hampton v. Hanrahan*, 600 F.2d 600,

---

[8] Based on the evidence in the record, the Court assumes this date should be January 29, 2014, as Defendant also postulates. *See* ECF Nos. 24-4 at 7, 16; 25-16 at 2; 38 at 10.

621 (7th Cir. 1970), *reversed in part on other grounds*, 446 U.S. 754 (1980)

(internal quotation omitted)).

Further, the civil conspiracy claim must be predicated on "a cognizable and

separate underlying claim." *Gossen v. JPMorgan Chase Bank*, 819 F. Supp. 2d

1162, 1171 (W.D. Wash. 2011). A "'[c]ivil conspiracy is, fundamentally, a

conspiracy to commit a tort.'" *Inteum Co., LLC v. Nat'l Univ. of Singapore*, No.

C17-1252-JCC, 2018 U.S. Dist. LEXIS 85713, at *7 (W.D. Wash. May 22, 2018)

(quoting James L. Buchwalter, 54 Causes of Action 2d 603, § 2); *see also Beck v.*

*Prupis*, 529 U.S. 494, 501, 503 (2000) ("[A]t common law, it was widely accepted

that a plaintiff could bring suit for civil conspiracy only if he had been injured by an

act that was itself tortious.").

Because the Court found that the state malicious prosecution and the First

Amendment retaliation claims should survive, the requirement of a cognizable

underlying claim is satisfied. *See Gossen v. JPMorgan Chase Bank*, 819 F. Supp. 2d

at 1171. Furthermore, the same evidence that supports material questions of fact

regarding whether Defendants' actions were coordinated for purposes of First

Amendment retaliation and whether those actions resulted in charging Plaintiff with

a misdemeanor also support the elements of common law civil conspiracy. *See*

*Mendocino Envtl. Ctr.*, 192 F.3d at 1302 ("'To be liable, each participant in the

conspiracy need not know the exact details of the plan, but each participant must at

least share the common objective of the conspiracy.'") (quoting *Phelps Dodge Corp.*, 865 F.2d at 1541). "The possibility that other inferences could be drawn that would provide an alternate explanation" for Defendants' actions "does not entitle them to summary judgment." *Mendocino Envtl. Ctr.*, 192 F.3d at 1303. Therefore, the Court does not dispose of the common law civil conspiracy claim on summary judgment.

Accordingly, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment, **ECF No. 17**, is **GRANTED IN PART** and **DENIED IN PART**.

2. Judgment shall be entered for Defendants on Plaintiff's Fourth Amendment Malicious Prosecution and Retaliation claims and Fourteenth Amendment claim. The remainder of Plaintiff's claims are preserved for trial.

3. Plaintiff's Motion for Partial Summary Judgment, **ECF No. 22**, is **DENIED**.

**IT IS SO ORDERED**. The District Court Clerk is directed to enter this Order, enter judgment as directed, and provide copies to counsel.

**DATED** January 23, 2020.

_s/ Rosanna Malouf Peterson_
ROSANNA MALOUF PETERSON
United States District Judge

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ~ 57